UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE BOARD OF DIRECTORS OF THE SAN DIEGO ASSOCIATION OF GOVERNMENTS, ACTING AS THE SAN DIEGO COUNTY REGIONAL TRANSPORTATION COMMISSION, on behalf of itself and all others similarly situated, | Case No. 21-cv-4893 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., BANC OF AMERICA SECURITIES LLC, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., CITIGROUP INC., CITIBANK, N.A., CITIGROUP GLOBAL MARKETS INC., CITIGROUP GLOBAL MARKETS LIMITED, GOLDMAN SACHS & CO. LLC, JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY & CO. LLC, MORGAN STANLEY CAPITAL GROUP INC., THE ROYAL BANK OF CANADA, RBC CAPITAL MARKETS, LLC, WELLS FARGO BANK, N.A., WACHOVIA BANK, N.A., WELLS FARGO FUNDS MANAGEMENT, LLC, and WELLS FARGO SECURITIES LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

1816671

## TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ...................................................................................1

JURISDICTION AND VENUE ...............................................................................6

THE PARTIES IN THIS CLASS ACTION..............................................................7

I.      PLAINTIFF SANDAG.................................................................................7

II.     DEFENDANTS..............................................................................................9

    A.      Defendant Barclays......................................................................9

    B.      Defendant Goldman Sachs..........................................................10

    C.      Defendant JP Morgan .................................................................10

    D.      Defendant Morgan Stanley .........................................................11

    E.      Defendant Bank of America ........................................................11

    F.      Defendant Citi.............................................................................12

    G.      Defendant RBC ...........................................................................13

    H.      Defendant Wells Fargo ...............................................................14

FACTUAL ALLEGATIONS .................................................................................15

I.      CALIFORNIA'S PUBLIC FINANCING CHALLENGES COME TO A HEAD
        IN THE LATE 2000s.................................................................................15

II.     THE VRDO MARKET................................................................................16

III.    DEFENDANTS CONSPIRED NOT TO COMPETE AGAINST EACH
        OTHER IN THE MARKET FOR REMARKETING SERVICES...................23

IV.     PLAINTIFF'S ECONOMIC ANALYSIS CONFIRMS DEFENDANTS'
        UNLAWFUL CONSPIRACY TO INFLATE VRDO INTEREST RATES...................38

    A.      Defendants Caused VRDO Rates to Be Significantly Inflated Compared to
                Rates of Similar Financial Products During the Class Period. .............39

    B.      Modeled VRDO Rates Are Consistently Lower Than Actual Rates....................44

    C.      VRDO Rates Show Significant "Clustering" During the Relevant Period...........47

# TABLE OF CONTENTS
## (Continued)

**Page**

V.     DEFENDANTS BREACHED THEIR CONTRACTUAL OBLIGATIONS AND
       FIDUCIARY DUTIES TO PLAINTIFF ........................................................................50

VI.    DEFENDANTS' CONSPIRACY INJURED PLAINTIFF AND CLASS
       MEMBERS ...............................................................................................................53

VII.   DEFENDANTS' CONCEALMENT OF THEIR UNLAWFUL CONDUCT ...............55

VIII.  A CLASS ACTION IS THE BEST METHOD TO RESOLVE THESE
       CLAIMS ....................................................................................................................57

CLAIMS FOR RELIEF .............................................................................................................61

Plaintiff THE BOARD OF DIRECTORS OF THE SAN DIEGO ASSOCIATION OF
GOVERNMENTS, ACTING AS THE SAN DIEGO COUNTY REGIONAL
TRANSPORTATION COMMISSION ("SANDAG" or "Plaintiff"), on behalf of itself and all
others similarly situated, as and for its Complaint against Defendants BANK OF AMERICA
CORPORATION, BANK OF AMERICA, N.A., BANC OF AMERICA SECURITIES LLC,
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, BARCLAYS BANK
PLC, BARCLAYS CAPITAL INC., CITIGROUP INC., CITIBANK, N.A., CITIGROUP
GLOBAL MARKETS INC., CITIGROUP GLOBAL MARKETS LIMITED, GOLDMAN
SACHS & CO. LLC, JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC,
MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY
& CO. LLC, MORGAN STANLEY CAPITAL GROUP INC., THE ROYAL BANK OF
CANADA, RBC CAPITAL MARKETS, LLC, WELLS FARGO BANK, N.A., WACHOVIA
BANK, N.A., WELLS FARGO FUNDS MANAGEMENT, LLC, and WELLS FARGO
SECURITIES LLC (collectively, "Defendants") alleges and avers as follows based upon
information and belief except as to those paragraphs that are based on personal knowledge:

## **NATURE OF THE ACTION**

1.      This is a class action arising from Defendants' years-long illegal conspiracy to,
among other things, unlawfully conspire to set and reset the interest rates of Variable Rate
Demand Obligations ("VRDOs") issued by Plaintiff and members of the proposed class of
similarly situated California public entities (the "Class," defined below).  As described herein,
Defendants' scheme was as simple as it was pernicious: first, identify their victims (here,
California public entities strapped for cash because of perpetual budget shortfalls); second, prey
on these fiscal vulnerabilities and convince each one of their victims to issue highly specialized
bond instruments that—in a properly functioning market—would provide those entities the

benefit of long-term financing at lower short-term interest rates; and third, conspire together to manipulate those rates in order to protect themselves from losses and preserve the integrity of their own books.  Put differently, Defendants' scheme was rigged to benefit Wall Street at the expense of multiple California City Halls and Main Streets: repeatedly, surreptitiously, and illegally conspiring to manipulate the rates of VRDOs to the detriment of Plaintiff and the Class in violation of federal and California antitrust laws, Defendants' contractual and fiduciary obligations to Plaintiff and the Class, and the California Unfair Competition Law.

2.     VRDOs are long-term debt instruments that cities, municipalities, political subdivisions, and other governmental entities issue to raise funds, typically to finance projects, capital investment, or operations.  As with other municipal debt instruments, most VRDOs are tax-exempt for investors, making them particularly attractive investments.  But unlike other long-term debt instruments, the interest rate of VRDOs reset on a periodic basis—typically on a weekly basis, and most commonly on Tuesdays or Wednesdays.

3.     While VRDOs are long term in nature from the issuing public entity's point of view, the weekly resets and a "put" feature inherent to VRDOs allow, and cause, investors to treat VRDOs like low-risk, short-term, highly secure, and liquid securities.  The "put" feature allows any holder of a VRDO to "put" the VRDO back to the issuer or liquidity provider (typically a letter-of-credit provider), or, in other words, to sell the VRDO back at par value plus accrued interest.  Theoretically, issuers and investors will both benefit from structuring VRDOs in this manner: issuers can raise cash and keep it for the long term, while only paying short-term interest rates; investors receive a security that is highly liquid and secure (in addition to being tax-exempt).

4.      Plaintiff and Class members contract with, and hire, financial institutions to manage the issuance, sale, repurchase, and resetting of interest rates of VRDOs.  In the argot of the VRDO community, these banks are called "remarketing agents" ("RMAs").  The RMAs' duties include finding purchasers at the time of the initial issuance of VRDOs, managing the weekly resets of rates, and finding purchasers for VRDOs that are tendered (or "put") back by an investor.  RMAs receive substantial fees from VRDO issuers in exchange for performing these duties.  RMAs are contractually obligated to set the interest rate for each VRDO issuance at the lowest possible rate that will allow the bonds to trade at par.[1]  This is exactly how each of the Defendants marketed themselves to Plaintiff and the Class: you get the financing you need; we do the rest.

5.      Banks also took on these RMA duties in the hopes of currying favor with issuers to create opportunities to sell issuers other more-lucrative services and financial products.  In particular, Defendants frequently would use their relationship from VRDOs to sell issuers derivative products, like fixed payer interest rate swaps.  Selling issuers interest rate swaps allowed the banks to make money twice: once on the VRDOs themselves, and again on the interest rate swaps.  Moreover, the swaps afforded the banks fees that were several times greater than what could be collected through VRDOs.

6.      The majority of VRDOs are purchased by money market mutual funds ("MMFs").[2]  MMFs are funds that hold only highly liquid, short-term investments.  As described in detail herein, *many of the same financial institutions that act as RMAs also own MMFs that*

---

[1] *See* Consolidated Class Action Complaint (Dkt. No. 107), *City of Philadelphia v. Bank of America Corp.*, 19-CV-1608/2667 (JMF) (S.D.N.Y. May 31, 2019) ("*Philadelphia v. BoA* Compl.") ¶¶ 3-4.

[2] Hilltop Securities, *Municipal Commentary* (Mar. 18, 2020) at 2, *available at* https://www.hilltopsecurities.com/media/3572/municipal-commentary_31820.pdf.

*invest in VRDOs*.  These financial institutions play both sides of the VRDO market.  The conflict of interest is obvious: on the one hand, issuers, including Plaintiff, hope to pay the lowest interest rate possible to minimize their interest expense, and RMAs promise to help them so that they pay the lowest interest rates possible; on the other hand, investors (MMFs) hope to receive the highest interest rate possible.  Unfortunately for the issuers, RMAs—who tend to be affiliates of MMFs—have the right to unilaterally set the interest rates that MMFs receive.  Until the U.S. Department of Justice began investigating the RMAs, including Defendants, for their collusive and illegal conduct, RMAs colluded to artificially inflate those rates at the expense of the issuers.

7.      Inflating VRDO rates provided RMAs another benefit: it reduced the likelihood that investors would ever exercise their "put" option and force the RMAs to find new buyers for the VRDOs.  Of course, the RMAs continued to collect fees for serving as remarketers, even though their unlawful actions dramatically reduced the likelihood of the RMAs ever having to actually remarket the VRDOs.

8.      Finally, the Defendant financial institutions found one additional method to extract bogus fees from issuers.  Most VRDO issuances need a backstop letter of credit to provide liquidity to investors in the event that an investor puts a VRDO back to the entity providing liquidity for the VRDO and the RMA is unable to find a new purchaser for the VRDO.  *The same financial institutions that served as RMAs, and that owned MMFs, also frequently served as providers of letters of credit to VRDO issuers.*  Providing these letters of credit gave the financial institutions another benefit from artificially inflating VRDO interest rates: higher interest rates led to a lower likelihood of investors putting back the VRDOs, which meant a lower likelihood of the letters of credit being drawn down to repurchase the VRDOs as the liquidity provider of last resort.  The financial institutions would still collect fees from providing

these letters of credit, even though they illegally took actions to reduce the likelihood that the letters of credit would ever be drawn down.

9.      Defendants improperly profited in several ways from their illegal price fixing scheme.  Among other things, Defendants received fees for acting as RMAs when, in reality, they were doing little more than nothing.  Defendants also received fees for serving as providers of letters of credit that would not be drawn down to the same extent as if Defendants did not illegally collude to keep VRDO rates high.  Defendants were able to provide their MMF affiliates with securities paying inflated interest rates that were far higher than short-term, municipal securities should have paid.  And Defendants were able to leverage these relationships to obtain significant fees by selling issuers highly profitable derivative products, like interest swaps.

10.      An economic analysis confirms that Defendants were engaged in a conspiracy to artificially inflate VRDO interest rates.  The analysis clearly shows that the conspiracy began in 2008 and ended in 2016 at nearly the exact same time that the U.S. Department of Justice began investigating Defendants for their unlawful VRDO practices.  During that period, VRDO rates were about equal with the rates of seven-day taxable commercial paper even though the former are tax-exempt.  Such a relationship defies economic logic.

11.      Defendants' actions resulted in Plaintiff and the Class members not receiving the services for which they had paid and paying higher rates of interest than they should have; and ultimately, Defendants' actions led to less money being available to a multitude of California public entities to finance their projects, initiatives, and operations.

12.      As competitors, Defendants were expected to compete vigorously, consistent with the principles of free-market competition.  Absent their illegal collusion, Defendants would have

competed with one another to set the lowest possible rates on each VRDO, and the most

competitive of them would have earned more business.  Unfortunately, however, Defendants

elected to conspire to eliminate competition to the benefit of the cartel they had formed—a

flagrant violation of federal and California antitrust laws and other applicable law.  By way of

this action, Plaintiff and the Class seek to obtain redress for this misconduct that the Supreme

Court has recognized as the "supreme evil of antitrust," *Verizon Communications Inc. v. Trinko*,

540 U.S. 398, 408 (2004).

## JURISDICTION AND VENUE

13.     Plaintiff brings this class action under federal law (the Clayton Act, 15 U.S.C.

§§ 15, 26, and the Sherman Act, 15 U.S.C. § 1) and California law (the Cartwright Act, Cal. Bus.

& Prof. Code § 16720) to recover treble damages and costs of suit, including reasonable

attorneys' fees, against Defendants for the injuries to Plaintiff and the Class, alleged herein,

arising from Defendants' violations of federal and California antitrust laws.  Plaintiff also asserts

claims against Defendants on a class-wide basis for Defendants' breaches of contract and

fiduciary duties, as well as violation of the California Unfair Competition Law (Cal. Bus. & Prof.

Code § 17200), to recover actual damages, restitution, and costs of suit, including reasonable

attorneys' fees.

14.     The Court has subject matter jurisdiction over this action pursuant to the Clayton

Act (15 U.S.C. §§ 15(a), 26) and 28 U.S.C. §§ 1331, 1337(a).  The activities of Defendants and

their co-conspirators were within the flow of, were intended to, and did have a substantial effect

on interstate commerce.

15.     The Court has jurisdiction over Defendants pursuant to 15 U.S.C. § 22.  Most

Defendants are subject to personal jurisdiction in the United States because they were formed in,

or have their principal places of business in, the United States.  The remaining Defendants are

members of the conspiracy and are subject to personal jurisdiction in the United States because the conspiracy was directed at, was carried out in substantial part in, and had the intended effect of causing injury to Plaintiff and members of the Class located in, residing in, or conducting business throughout the United States.

16.     Defendants are subject to personal jurisdiction because each one of them—either directly or through its respective agents or affiliates—conducted or transacted business throughout the United States (including in this District), which was directly related to the claims alleged in this Complaint and at issue in this class action.  To the extent any Defendant is not subject to jurisdiction in any state's courts of general jurisdiction, this Court still has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2) as this Court's exercise of jurisdiction is consistent with the United States Constitution and federal laws.

17.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22, as well as 28 U.S.C. § 1391(b), (c), (d).  During the relevant time period, all Defendants resided, transacted business, were found, or had agents in this District, a substantial part of the events or omissions giving rise to the claims asserted in this Complaint occurred in this District, and a substantial portion of the affected interstate trade and commerce alleged and averred in this Complaint was carried out in this District.

### THE PARTIES IN THIS CLASS ACTION

I.     **PLAINTIFF SANDAG**

18.     The San Diego Association of Governments is a legislatively created government agency that functions as the primary planning, transportation, transit construction, and research agency in the San Diego, California region.  As a large, one-county metropolitan planning organization, SANDAG provides a public forum for regional policy decisions about growth,

transportation planning, transit construction, environmental management, housing, open space, energy, public safety, and binational topics.

19.     The San Diego Association of Governments is governed by a Board of Directors composed of mayors, councilmembers, and a county supervisor from each of the region's 19 local governments: City of Carlsbad, City of Chula Vista, City of Coronado, City of Del Mar, City of El Cajon, City of Encinitas, City of Escondido, City of Imperial Beach, City of La Mesa, City of Lemon Grove, City of National City, City of Oceanside, City of Poway, City of San Diego, City of San Marcos, City of Santee, City of Solana Beach, City of Vista, and County of San Diego.  Supplementing these voting members are advisory representatives from Imperial County, the U.S. Department of Defense, California Department of Transportation, Metropolitan Transit System, North County Transit District, Port of San Diego, San Diego County Water Authority, Southern California Tribal Chairmen's Association, Mexico, and the San Diego County Regional Airport Authority.

20.     In carrying out its responsibilities for transit planning, project implementation and construction of regional transit projects in San Diego County, the San Diego Association of Governments is also assisted by a group of professionals consisting of approximately 250 planners, engineers, research specialists and supporting staff.

21.     Pursuant to California Public Utilities Code Section 132051, the Board of Directors of the San Diego Association of Governments also acts as the San Diego County Regional Transportation Commission.  Organized pursuant to the San Diego County Regional Transportation Commission Act, the San Diego County Regional Transportation Commission was created by the California legislature to help finance the cost of maintaining, acquiring, constructing and developing facilities for transportation systems in the County of San Diego in

order to increase economic opportunities, contribute to economic development, act in the public interest and serve a public purpose, and promote the health, safety and welfare of the citizens of the County of San Diego.

22.     The San Diego County Regional Transportation Commission is responsible for providing improvements to the transportation and other public infrastructure systems in San Diego County, including planning and constructing roads, trolley lines, bikeways, and walkways.

23.     As part of fulfilling this responsibility – including, among others, the financing of the Mid-Coast Trolley project that is set to extend Blue Line Trolley service from Santa Fe Depot in Downtown San Diego to the UC San Diego community – the Board of Directors of the San Diego Association of Governments, acting as the San Diego County Regional Transportation Commission, issued several VRDOs affected by the misconduct alleged herein, including the following listed below:

| Issuance | CUSIP |
|---|---|
| San Diego Cnty Calif Regl Transn Commn Sales Tax Rev Var Rev Bds 2008A | 797400FF0 |
| San Diego Cnty Calif Regl Transn Commn Sales Tax Rev Var Rev Bds 2008B | 797400FG8 |
| San Diego Cnty Calif Regl Transn Commn Sales Tax Rev Var Rev Bds 2008C | 797400FH6 |
| San Diego Cnty Calif Regl Transn Commn Sales Tax Rev Var Rev Bds 2008D | 797400FJ2 |

## II.     DEFENDANTS

### A.     Defendant Barclays

24.     Defendant Barclays Bank PLC is a corporation organized under the laws of England and Wales.  Its principal place of business is in London, England, and it has branch locations in New York, New York.

25.     Defendant Barclays Capital Inc. is a corporation organized under the laws of the State of Connecticut.  Its principal place of business is in New York, New York.

26.     Defendants Barclays Bank PLC and Barclays Capital Inc., and their subsidiaries and affiliates, are referenced collectively as "Barclays" in this Complaint.  Barclays signed VRDO remarketing agreements with and provided letters of credit for members of the Class.

### B.     <u>Defendant Goldman Sachs</u>

27.     Defendant Goldman Sachs & Co. LLC is a corporation organized under the laws of the State of Delaware.  Its principal place of business is in New York, New York.

28.     Defendant Goldman Sachs & Co. LLC, and its subsidiaries and affiliates, are referenced collectively as "Goldman Sachs" in this Complaint.  Goldman Sachs signed VRDO remarketing agreements with and provided letters of credit for members of the Class.

### C.     <u>Defendant JP Morgan</u>

29.     Defendant JPMorgan Chase Bank, N.A., a wholly owned subsidiary of JPMorgan Chase & Co., is a federally chartered national banking association with its principal place of business in New York, New York.

30.     Defendant J.P. Morgan Securities LLC (formerly, "J.P. Morgan Securities Inc.") is a limited liability company organized and existing under the laws of the State of Delaware.  Its principal place of business is in New York, New York.

31.     Defendants JPMorgan Chase Bank, N.A. and J.P. Morgan Securities LLC, and their subsidiaries and affiliates, are referenced collectively as "JPMorgan" in this Complaint. JPMorgan signed VRDO remarketing agreements with and provided letters of credit for members of the Class.

D.     **Defendant Morgan Stanley**

32.     Defendant Morgan Stanley is a corporation organized under the laws of the State of Delaware.  Its principal place of business is in New York, New York.

33.     Defendant Morgan Stanley & Co. LLC, a wholly owned subsidiary of Morgan Stanley, is a limited liability company organized under the laws of the State of Delaware.  Its principal place of business is in New York, New York.

34.     Defendant Morgan Stanley Smith Barney LLC (doing business as Morgan Stanley Wealth Management) is a wholly owned subsidiary of Defendant Morgan Stanley & Co. LLC and is a limited liability company organized under the laws of the State of Delaware.  Its principal place of business is in New York, New York.

35.     Defendant Morgan Stanley Capital Group Inc., a wholly owned subsidiary of Morgan Stanley, is a corporation organized under the laws of the State of Delaware.  Its principal place of business is in New York, New York.

36.     Defendants Morgan Stanley, Morgan Stanley & Co. LLC, Morgan Stanley Smith Barney LLC, and Morgan Stanley Capital Group Inc., and their subsidiaries and affiliates, are referenced collectively as "Morgan Stanley" in this Complaint.  Morgan Stanley signed VRDO remarketing agreements with and provided letters of credit for members of the Class.

E.     **Defendant Bank of America**

37.     Defendant Bank of America Corporation is a corporation organized under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina. Defendant Bank of America Corporation is an international banking and financial services corporation.  Its investment banking division is based in New York, New York.

38.     Defendant Bank of America, N.A. is a federally chartered national banking association with its principal place of business in Charlotte, North Carolina.  It is an indirect, wholly owned subsidiary of Defendant Bank of America Corporation.

39.     Defendant Banc of America Securities LLC was a Delaware limited liability corporation with its principal place of business in New York, New York.  On November 1, 2010, it merged into Merrill Lynch, Pierce, Fenner & Smith Incorporated, with Merrill Lynch, Pierce, Fenner & Smith Inc. as the surviving corporation.  Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a corporation organized under the laws of Delaware with its principal place of business in New York, New York; it is a wholly owned subsidiary of Bank of America Corporation.

40.     Defendants Bank of America Corporation, Bank of America, N.A., Merrill Lynch, and Banc of America Securities LLC, and their subsidiaries and affiliates, are referenced collectively as "Bank of America" in this Complaint.  Bank of America signed VRDO remarketing agreements with and provided letters of credit for members of the Class.

F.     **Defendant Citi**

41.     Defendant Citigroup Inc. is a Delaware corporation with its principal place of business in New York, New York.

42.     Defendant Citibank, N.A. is a federally chartered, national banking association with its principal place of business in Sioux Falls, South Dakota; it is a subsidiary of Defendant Citigroup Inc.

43.     Defendant Citigroup Global Markets Inc., a New York corporation, is an indirect, wholly owned subsidiary of Defendant Citigroup Inc.  Its principal place of business is in New York, New York.

44.     Defendant Citigroup Global Markets Limited is a U.K.-registered private limited company with its principal place of business in London, United Kingdom.  Defendant Citigroup Global Markets Limited is an indirect, wholly owned subsidiary of Defendant Citigroup Inc.

45.     Defendants Citigroup Inc., Citibank, N.A., Citigroup Global Markets Inc., and Citigroup Global Markets Limited, and their subsidiaries and affiliates, are collectively referred to as "Citi" in this Complaint.  Citi signed VRDO remarketing agreements with and provided letters of credit for members of the Class.

**G.     <u>Defendant RBC</u>**

46.     Defendant The Royal Bank of Canada is a company organized under the laws of Canada with its principal place of business in Toronto, Ontario, Canada.  Defendant The Royal Bank of Canada has substantial operations in the United States, including in New York, New York.  Defendant The Royal Bank of Canada is a registered foreign bank with the Federal Reserve with assets of over $100 billion in the United States.  It is also a registered broker-dealer with the Securities and Exchange Commission ("SEC"), registered with Financial Industry Regulatory Authority ("FINRA"), licensed by the New York Department of Financial Services, and a futures commission merchant with the Commodity Futures Trading Commission.

47.     RBC Capital Markets, LLC (formerly "RBC Capital Markets Corporation") is a business segment of Defendant The Royal Bank of Canada incorporated in the United States.  New York, New York is its principal place of business and the location of its headquarters.

48.     Defendants The Royal Bank of Canada and RBC Capital Markets, LLC, and their subsidiaries and affiliates, are referenced collectively as "RBC" in this Complaint.  RBC signed VRDO remarketing agreements with and provided letters of credit for members of the Class.

H.     **Defendant Wells Fargo**

49.     Defendant Wells Fargo Bank, N.A. is a corporation organized under the laws of the State of Delaware.  Its principal place of business is in San Francisco, California.

50.     From 2002 to 2008, Defendant Wachovia Bank, N.A. was a federally chartered bank with its principal place of business in Charlotte, North Carolina; it was wholly owned by Wachovia Corporation.  In October 2008, Wells Fargo & Co. agreed to acquire Wachovia Corporation, and in March 2010, Wachovia Bank, N.A. merged with Wells Fargo Bank, N.A. to make Defendant Wells Fargo Bank, N.A., its successor by merger.[3]

51.     Defendant Wells Fargo Funds Management, LLC, is a wholly owned subsidiary of Wells Fargo & Company, organized and existing under the laws of the State of Delaware.  Its principal place of business is in San Francisco, California.

52.     Defendant Wells Fargo Securities LLC is a limited liability company organized and existing under the laws of Delaware.  Its principal place of business is in Charlotte, North Carolina.

53.     Defendants Wells Fargo Bank, N.A., Wachovia Bank, N.A., Wells Fargo Funds Management, LLC, and Wells Fargo Securities LLC, and their subsidiaries and affiliates, are collectively referred to as "Wells Fargo" in this Complaint.  Wells Fargo signed VRDO remarketing agreements with and provided letters of credit for members of the Class.

54.     Any reference to any Defendant entity includes that entity, its parent companies, subsidiaries, affiliates, predecessors, and successors.  In addition, whenever reference is made to any act, deed, or transaction of any entity, the Complaint is alleging that the entity engaged in the

---

[3] "Wachovia," as used herein, includes Defendant Wells Fargo Bank, N.A., its successor by merger.

act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

55.     Other entities, persons, firms, and/or corporations—unknown and not named as defendants—participated as co-conspirators with Defendants and performed acts and/or made statements in furtherance of the conspiracy.  Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not as Defendants in this Complaint.

## **FACTUAL ALLEGATIONS**

I.     **CALIFORNIA'S PUBLIC FINANCING CHALLENGES COME TO A HEAD IN THE LATE 2000s**

56.     It is a well-known truism of American public finance that it has never been an easy matter to maintain the fiscal strength of public entities in the state of California.  Lurking behind the state's obvious geographical advantages lie a plethora of challenges that make the ongoing financing of operations and infrastructure in California especially difficult for even the most experienced financial managers.  These include, among other things, thousands of particular laws that restrict taxing and spending authority, population growth, extreme heat, drought, air quality, fires, earthquakes, unsustainable collective bargaining and defined benefit pension obligations, erosion, and aging infrastructure.

57.     Many of these challenges came to a head in the late 2000s and early 2010s, when the global financial crisis caused in part by the 2007 and 2008 collapse of the market for residential mortgage-backed securities caused a ripple effect throughout the broader California economy.  It was during this time period that the devastating impact of rising residential foreclosures and business bankruptcies combined with fixed and increasing expenses created a perfect storm for the balance sheets of public entities throughout the state of California.

58.     For several public entities in California, the pressure was too much during this time period.  In 2008, faced with declining revenues and fixed and increasing public expenditures, the City of Vallejo became the largest city in California ever to declare bankruptcy under Chapter 9 of the Bankruptcy Code—drawing the city's general fund reserves down to zero, canceling non-departmental funding, reducing fleet replacement below the minimum needed, coming dangerously close to being unable to meet payroll obligations, and postponing or eliminating critical infrastructure repairs.[4]

59.     Four years later—in 2012—the cities of San Bernardino and Stockton followed suit.[5]  Hammered, as they were, by the effects of the financial crisis at the same time that funding obligations were becoming more of a burden—and with interest and other payments related to poorly-timed bond offerings creating even more of a crisis—each of these two California cities found itself unable to continue its fiscal operations absent the pain of the bankruptcy process, only exiting the process many years later.

## II.     THE VRDO MARKET

60.     Where California had a problem, Wall Street offered a solution (or so it claimed): long-term variable rate debt, or VRDOs.  Throughout the early 2000s time period—in order to gain a foothold with potentially valuable California public entity clients—financial institutions including Defendants aggressively marketed VRDOs and other financial products, like associated interest rate swaps, to members of the Class as one way of solving ongoing fiscal issues.

---

[4] *See, e.g.*, "San Francisco suburb Vallejo files for bankruptcy," *Reuters*, May 23, 2008.

[5] *See, e.g.*, "How Stockton went broke: a 15-year spending binge," *Reuters*, July 3, 2012; *see also, e.g.*, "San Bernardino, California, files for bankruptcy with over $1 billion in debts," *Reuters*, August 1, 2012.

61.     A VRDO is a type of municipal bond.  The primary advantage that VRDOs offer municipal issuers is that they allow issuers to obtain long-term financing while only paying (typically lower) short-term interest rates for that financing.  VRDOs are issued by cities, counties, other municipal institutions (*e.g.*, water districts), and other political subdivisions.  Sometimes, they are also issued on behalf of certain charitable organizations.  The market for VRDOs in the United States is extremely large.  Upon information and belief, $277 billion VRDOs were issued from 2007 through 2016, of which $32 billion were issued by California-based issuers.  The total market capitalization of outstanding VRDOs peaked in the mid-2000s; but to date, there are still approximately 10,000 VRDOs outstanding in the United States with a total market capitalization of $224 billion.

62.     The "variable" nature of VRDOs is one of their primary features, and one of the primary differentiators between VRDOs and typical, fixed-rate municipal bonds.  VRDOs are typically issued with long-term maturities of twenty or thirty years, but they pay interest at a rate that is reset periodically, typically every week.  The interest rate is reset by a remarketing agent ("RMA"), a financial institution engaged by the issuer to manage the VRDO.  As alleged and averred further herein, the interest rate is set at the RMA's sole discretion; but the RMA is obligated to set the interest rate at the lowest rate possible that would result in a VRDO selling at par value.  In a properly functioning market, this results in the lowest possible interest expense for the issuer.

63.     The "put" feature inherent to VRDOs is another feature that distinguishes VRDOs from typical municipal bonds.  Every holder of a VRDO has the option, at its sole discretion, to choose to sell the VRDO on each remarketing date (regardless of whether the holder wants its money back or is unhappy with the rate) and, in return, to receive the full par value plus any

accrued interest.  When a VRDO holder exercises this option, the RMA is then obligated to find another buyer for the security.  If the RMA cannot find another buyer, the writer of the VRDO's letter of credit (which in many instances is an affiliate of the RMA) will step in and provide liquidity to the holder who exercised the put option.[6]

64.     VRDOs are virtually always secured by letters of credit ("LOCs") or standby bond purchase agreements ("SBPAs") from major financial institutions, such as Defendants or affiliates thereof.  The liquidity that the LOC holders provide ensures that any VRDO investors who opt to exercise their put option will be able to sell their VRDO holdings at any time—even if the VRDO is not fully matured and may not mature for years or decades—and receive the full par value, plus any accrued interest, now.

65.     From an investor's standpoint VRDOs are attractive because of their tax-exempt nature.[7]  Investors also view VRDOs as incredibly safe and liquid securities because of the put option and letter of credit backstop features.[8]

66.     The high level of liquidity for VRDOs makes them eligible for purchase by money market mutual funds ("MMFs").  Additionally, since VRDOs are issued in minimum increments of $100,000, most retail investors (*i.e.,* "Mom-and- Pop") purchase VRDOs indirectly through holding MMFs.  Tax-exempt MMFs are the largest holder of VRDOs.

### 1.     Investors

67.     MMFs are a specific type of mutual fund that only hold highly liquid, highly secure securities like cash, cash equivalents, and very high-rated debt with short-term maturities.

---

[6] *Philadelphia v. BoA* Compl. ¶ 70.

[7] *Id.* ¶ 61.

[8] *Id.* ¶ 71.

Most MMFs aim to maintain a share value of $1, while also earning interest for their investors. Investors are attracted to MMFs due to their high levels of liquidity and low levels of risk of loss of principal.

68.     In 2014, the Securities and Exchange Commission stated that MMFs owned nearly all the outstanding VRDOs in the market.[9]  MMFs are typically widely held and are eligible for purchase by retail (*i.e.,* "Mom and Pop") investors.[10]

69.     VRDOs are attractive to MMFs because of their put feature, their liquidity, and their credit support.  An MMF that holds a VRDO knows that it can sell a VRDO at par at any remarketing date, because of the put feature, and the LOC means that the MMF knows that it will have a buyer.  This means that VRDOs are both highly liquid and have very low risk of loss of principal.[11]

70.     Tax-exempt MMFs are a specific type MMF that only invest in tax-exempt securities, such as municipal debt.  VRDOs are very attractive to tax-exempt MMFs because of the liquidity and high quality of VRDO debt.  Most Defendants had affiliates that sponsored tax-exempt MMFs, which were some of the largest investors in VRDOs.[12]

---

[9] Chuck Boyer and Kelly Posenau, *The Impact of the Shadow Banking Sector on Public Finance, July 2020 Draft, Brookings Institute*, at 9, *available at* https://www.brookings.edu/wp-content/uploads/2020/06/BoyerPosenau_MMFMunis_Brookings_FinalDraft7.9.2020.pdf

[10] *Id*. at 10.

[11] *See* Dan Skoklochenko, *What Makes Variable Rate Demand Notes Stand Out?* (Aug. 28, 2018), *available at* https://private-wealth.us.cibc.com/blog/-/blogs/what-makes-variable-rate-demand-notes-stand-out-.

[12] *See Philadelphia v. BoA* Compl. ¶ 72

2.      **Remarketing Agents ("RMAs")**

71.      RMAs are the driving force behind the VRDO market, and upon information and belief, the Complaint alleges and avers that Defendants serve as RMAs for over 65% of the VRDO market as measured by total market capitalization.

72.      RMAs have three primary functions for each VRDO they manage.  First, RMAs are paid a fee to place the VRDOs when they are initially sold into the market to investors. Second, RMAs earn a separate ongoing fee to run the periodic interest rate reset process, where, for each VRDO they manage, they are obligated to price the VRDO at the lowest interest rate that would allow it to trade at par.  Third, RMAs are required to remarket, or resell, any VRDOs that are tendered by investors.

73.      For each VRDO, an RMA's obligations to issuers, including Plaintiff and members of the Class, are governed by three sets of documents: (1) a Remarketing Agreement, (2) a Bond Indenture, and (3) Official Statements.  Remarketing Agreements are contracts between issuers and RMAs.  Bond Indenture documents are the issuing documents governing the entirety of the VRDO offering.  Remarketing Agreements and Bond Indentures—binding contracts to which issuers and RMAs are parties—obligate RMAs to, among other things, price VRDOs at the lowest interest rate possible, and to remarket VRDOs that are tendered by investors.  Official Statements are the disclosure documents presented to investors who purchase, or are considering to purchase, VRDOs.  They are not binding contracts like Remarketing Agreements and Bond Indentures, but they summarize the obligations listed in those documents and distill those two sets of documents into a format that is easier for investors to understand and

digest.[13]  Examples of the specific obligations that Defendants made to Plaintiff and other members of the Class are discussed below.

74.     Issuers, including Plaintiff, paid large annual ongoing fees to RMAs for their services in addition to the initial placement fees.  These fees were normally in the range of six to ten basis points annually multiplied by the amount of bonds outstanding, or one tenth of one percent.  For any individual VRDO, these fees were large, and in the aggregate, these fees are measured in the hundreds of millions of dollars.  For example, SDRTC paid over $3 million in VRDO RMA fees between June 2009 to March 2020, and more than 75% of those fees were paid to Defendants Barclays, Goldman, and JP Morgan.  Plaintiff agreed to pay these fees because it believed those Defendants would remarket VRDOs that were tendered by investors and would set VRDO interest rates at the lowest possible level, as they were obligated to.

### 3.     Liquidity Providers

75.     VRDOs are virtually always backed by LOCs (or, on occasion, by Standby Bond Purchase Agreements - SBPAs) that large financial institutions provide.  These LOCs guarantee that the issuing financial institution will step in and pay any VRDO investor the full face value and accrued interest when the issuer fails to make a payment (for example, when an investor exercises the put option to force the liquidity provider to buy back the VRDO).  In effect, the creditworthiness of the financial institution that writes the LOC takes the place of the creditworthiness of the issuer: even if the issuer defaults, the LOC writer will make the investor whole immediately.

76.     The RMA and LOC provider are often the same financial institution or affiliates for any given VRDO.  This creates an inherent conflict of interest.  When an investor in such a

---

[13] *Philadelphia v. BoA* Compl. ¶¶ 75-76.

VRDO tenders its bond for sale, the RMA is forced to find a new investor to take the redeeming

investor's place; if it fails to do so, the affiliated LOC provider will have to purchase the VRDO.

The affiliated RMA and LOC provider's reluctance to have to either take the bond into inventory

or draw down its letter of credit and place the VRDO on its books incentivizes the RMA to price

the VRDO at an artificially high level to encourage a third party to purchase the VRDO.

77.     Defendant LOC providers were handsomely rewarded for providing these LOCs

that, through their RMA activities, mitigated any risk they would be drawn upon.  Typical fees for

an LOC for a VRDO range from 50 to 150 basis points (0.5% to 1.5%) of the face value of the

VRDO annually.  Plaintiff and Class members agreed to pay these fees because they believed

that Defendants were providing them a valuable service; but in reality, Defendant LOC providers

worked with their RMA counterparts to ensure that the LOCs would not have to be utilized to

nearly the extent that they would have been absent Defendants' conspiracy.  As a result, Plaintiff

and Class members paid those fees but did not receive the services for which they were paying.

*     *     *

78.     Defendants were engaged in every step of the VRDO process.  RMAs helped

manage the VRDOs and ran the rate resetting process, and then, at least in theory, found new

investors when existing investors tendered their bonds.  Defendants then purchased VRDOs

through their MMFs, often at inflated rates of interest enjoying all of the benefits that VRDO

holders should rightfully have (*e.g.*, high levels of liquidity and low risk) and other benefits that

their conspiracy illegally created (*e.g.*, artificially high interest rates).  Defendants—not content

with receiving these above-market interest rates in their MMFs and receiving RMA fees that they

did not earn—also wrote LOCs against VRDOs (and then took steps to ensure that the LOC-

provided protection would not be needed) and marketed and sold interest rate swaps to issuers (and then secured even larger fees).

79.     This conspiracy benefitted Defendants in several ways.  Unfortunately, for every improper benefit Defendants received, the issuers—including Plaintiff—suffered.  Issuers had to pay above-market interest rates due to Defendants' collusive activity, paying unnecessarily high financing costs, and issuers were overcharged hundreds of millions of dollars in fees.  Ultimately, this harm falls upon taxpayers, and the citizens who reside and work in the counties and cities in California who have been forced to pay higher taxes and/or receive fewer or lower quality government services as a result of Defendants' illegal activity.

### III.    DEFENDANTS CONSPIRED NOT TO COMPETE AGAINST EACH OTHER IN THE MARKET FOR REMARKETING SERVICES

80.     Despite their obligations as RMAs and LOC providers, from 2008 to 2016, Defendants became increasingly concerned that VRDOs could become an unjustified loss leader for each of the Defendants rather than a profit center.  During and after the 2008 financial crisis, the funding costs and the costs of carry for Defendants and other banks grew significantly.  The cost of carry for each of the Defendants was simply its borrowing cost relative to the interest earned as "owner" of the VRDO.  After 2008, Defendants experienced a significant increase in their own borrowing costs as a result of the financial crisis and the general concern among lenders regarding Defendants' credit worthiness.  To the extent Defendants' borrowing costs were higher than the rate of interest on the VRDOs, each Defendant would lose money by placing these VRDOs in its own inventory.  As a result, Defendants were incented to keep VRDOs off of their balance sheet.  Said another way, a bank's costs associated with carrying the value of investments, including potentially having to place VRDOs in inventory and on its balance sheet, grew to such a point that, if an investor tendered a VRDO and the RMA could not

secure a new investor, the cost of carry could substantially outweigh the fees the bank collected

from the VRDO.  Therefore, in an effort to avoid the spilling of yet more red ink during and after

the 2008 financial crisis, Defendants began conspiring in violation of state and federal law to

protect their books at the expense of Plaintiff and members of the Class.

81.     For example, and since as early as February 2008, Defendants conspired—from

the top down—not to compete against each other in the market for remarketing services.

Defendants conspired to keep interest rates on VRDOs artificially high, to benefit themselves

and the MMFs that were the predominant holders of VRDOs, and to the detriment of VRDO

issuers.  Defendants' personnel communicated regarding proprietary information such as VRDO

inventory and planned changes to VRDOs' "base rates," particularly before rates were reset.

This chatter occurred regularly (almost daily) by telephone, at in-person meetings, through

Bloomberg messaging technology, and using third-party intermediaries, including the VRDO

investors.

82.     Defendants' coordination was easy to accomplish and conceal.  At each bank,

there was a relatively small number of individuals who were directly involved in the market for

remarketing services.  Defendants generally employed between one and three individuals who

handled the relevant remarketing function on a day-to-day basis.  Defendants' conspiracy as to

VRDO rates took hold and flourished during the Class Period, when it was easier to coordinate

their efforts.[14]

83.     During the Class Period, key personnel from Defendants' remarketing desks had

opportunities to meet face to face and to collude at industry events and through industry clubs.

These key personnel included Patrick Boyer (Barclays), David Lo (Barclays), Cynthia Klein

---

[14] *Philadelphia v. BoA* Compl. ¶¶ 95, 98.

(Goldman), Drew Rowley (Morgan Stanley), Peter McCarthy (JPMorgan), Jim Brewer (Bank of America), Ken Rogers (Bank of America), Dan Blankenship (Bank of America), Rob Toscanini (Citi), Craig Laraia (RBC), Julie Chavez (Wells Fargo), and Laurie Mount (Wells Fargo).[15]

84.     For example, the Bond Buyer, a reporting outlet serving the municipal finance community, hosted regular municipal bond conferences around the country, including the National Muni Bond Summit (an annual three-day conference beginning in 2009) and the California Public Finance Conference (a three-day conference held annually since 1990). Representatives from Defendants Barclays, Citi, Goldman Sachs, JPMorgan, Bank of America, RBC, and Wells Fargo attended these conferences.[16]

85.     The Municipal Bond Club of New York and the Municipal Women's Bond Club of New York hosted events for investment funds and remarketing agents as well as occasional substantive panels, such as the "Short Term Muni" panel hosted in June 2015, and an annual Municipal Bond school.[17]

86.     VRDO coordination meetings and communications occurred involving senior personnel sitting within Defendants' Municipal Securities Groups, which housed the Short Term Products desks for Defendants' VRDO operations.  During the Class Period, these senior personnel included Robert Taylor (Barclays), Peter Bartlett (Citi), Dan Bingham (Goldman), Kyle Pulling (JPMorgan), J.R. McDermott (Morgan Stanley), Mona Payton (Bank of America), Chris Hamel (RBC), Todd Bleakney (Bank of America and Wells Fargo), and Martin Bingham (Wells Fargo).  From 2009 through 2013, Defendants Bank of America, Barclays, Citi, Morgan

---

[15] *Philadelphia v. BoA* Compl. ¶¶ 91, 93, 95.

[16] *Id.* ¶ 94.

[17] *Id.* ¶ 94.

Stanley, and Wells Fargo were among the top 10 remarketing agents in the market.  A SIFMA report shows that by December 2011, Defendants collectively served as remarketing agents for a majority of the outstanding VRDO bonds.[18]

87.    Provision of liquidity (largely through letter of credit services) is concentrated among a few firms.  Defendants provide such services for much of the VRDO market.  For example, Defendants JPMorgan, Bank of America, and Wells Fargo accounted for approximately 40% of the VRDO-credit-support market in 2011 through 2013.  By 2013, Defendants Barclays, RBC, and Citi were each ranked in the top ten credit-support providers.[19]

88.    Defendants' personnel, working at competing banks, also communicated directly in furtherance of the conspiracy.  Through these communications, personnel—including those working at Defendants' Municipal Securities Groups—shared sensitive and competitive information that was material to setting and resetting VRDO rates, to inventory levels, and to base rates (*i.e.*, the baseline rates applied across Defendants' VRDOs, which were intended to account for prevailing macroeconomic factors that impact VRDOs).[20]

89.    Through these communications, Defendants provided each other information to coordinate their weekly resets of VRDO rates.  Defendants set their VRDO rates relative to "base rates," such that the rate for each VRDO was set at a particular spread of basis points above that "base rate."  And then merely by making a simple change to the base rate—and without having to expend any real remarketing resources to get the lowest possible VRDO rates—Defendants could reset anywhere from tens to thousands of VRDO rates in a single stroke and at the same

---

[18] *Philadelphia v. BoA* Compl. ¶ 97

[19] *Id.* ¶ 98.

[20] *Id.* ¶¶ 99, 100.

time set the rate high enough to minimize any risk of the VRDOs being tendered.  A Defendant may, after a particular VRDO was issued, set that VRDO's rate at a spread of 30 basis points above the bank's base rate; if the base rate increased by one basis point the following week, the VRDO's rate would be set at 30 basis points above that new base rate.[21]

90.     Because Defendants used these base rates, and then fixed spreads off those base rates, by communicating and colluding with other RMAs about their changes to the base rate in a given week, the RMAs could convey how they planned to move VRDOs that week.  This process could take as little as thirty minutes.[22]

91.     For example, a former managing director at Defendant Citi averred that Defendants' RMA staff would call each other on the phone before setting rates, asking: "Are you going high or are you going low?"  A former senior RMA personnel at Defendant JPMorgan averred that it was a "dirty little secret" that RMAs would talk to each other about rates and would ask other RMAs questions, like, "Are you placing this paper [referring to a specific VRDO or group of VRDOs], and if so, what will be the rate?"  Another high-ranking industry insider confirmed that communications were rampant between sales desks at Defendants.  The individuals working at the sales desks would stay in contact regularly, asking each other questions that were clear code for what VRDO rates Defendants planned to set (*e.g.*, whether they expected rates to "spike up," "How much cash is in the market?," or "How are things trending?").[23]

---

[21] *Philadelphia v. BoA* Compl. ¶ 102.

[22] *Id.*

[23] *Philadelphia v. BoA* Compl. ¶ 101.

92.     A former senior RMA at one Defendant bank averred that, when it comes to setting rates, "No one wants to stand out."  Accordingly, rather than endeavor to obtain the lowest rates for each VRDO based on the VRDO's individual characteristics (*e.g.*, the issuer or letter of credit provider), Defendants shared information to collectively ensure they set rates that were high enough to benefit all Defendants.[24]

93.     An insider explained that the RMAs responsible for setting VRDO rates had another motive to conspire to keep interest rates high: Defendants' senior management exerted substantial pressure on these RMAs to keep VRDOs off the banks' books.  Otherwise, RMAs risked losing money and ultimately their jobs at the banks.[25]

94.     Banks also viewed VRDOs as a product to attract more business.  Banks could attract high-value, high-net-worth retail customers with enough money to purchase VRDOs directly rather than through MMFs.  In addition to selling these wealthy clients VRDOs, it allowed the banks to then upsell these customers other higher-margin services.  Banks also could strengthen their relationship with issuers, which would allow the banks to then sell issuers higher-margin derivative products, like interest rate swaps, or obtain lucrative business underwriting fixed-rate bonds.  Due in part to the immense pressure banks exerted to keep VRDOs out of the banks' own inventories, RMAs—a consequently close-knit community across the banks—felt compelled to "artificially prop up interest rates" to ensure VRDOs stay off the banks' books.  To that end, the RMAs coordinated through phone calls, an instant messenger

---

[24] *Id.* ¶ 103.

[25] *See id.* ¶ 104.

application built into the Bloomberg terminal used across banks, and other means alleged and averred herein.[26]

95.     These personnel working at the various Defendants' remarketing desks were also close because of the revolving door at the Defendant banks.  Throughout the Class Period, key employees of the Defendant banks would leave their job to take a job at another Defendant bank.  For example, in 2015, Dan Blankenship left Defendant Bank of America for Defendant Barclays.  David Lo, who had worked as a municipal bond trader at Defendant Barclays until April 2013, began working at Defendant Morgan Stanley in July 2015.  And Julie Chavez, who has worked at Defendant Wells Fargo since 2009, worked at Defendant Bank of America until 2008.  David Bingham worked at Defendant Goldman Sachs during the Class Period, but he also worked at Defendant Citi from 1987 until 2007.  The movement of key personnel between the Defendant banks strengthened Defendants' connections and furthered their opportunities to collude.

96.     Defendants also discussed and exchanged other commercially sensitive information to ensure that rates remained high enough to benefit Defendants.  A former Wells Fargo RMA explained how a Wells Fargo RMA would call other banks' RMAs to ask how their inventory levels were looking by asking: "Are you heavy or light?"  By sharing this information, Defendants with higher inventory levels were more likely to offer higher rates so that they could reduce their inventory.  That former senior RMA at Wells Fargo also represented that one RMA would "Have a pretty good idea" of the rate resets of another RMA if it knew the other RMA's inventory level and believed that VRDO reset rates were highly correlated to Wells Fargo's inventory levels.  At points where the banks' VRDO inventories increased, the RMAs from

---

[26] *See Philadelphia v. BoA* Compl. ¶ 104.

different banks would discuss their inventory levels and, thereby, could determine how much they should increase their rates to quickly decrease the levels of VRDOs they held in inventory.[27]

97.     There is no lawful justification for Defendants at competing RMA banks to discuss VRDO rates or to exchange other sensitive competitive information.  A former senior RMA personnel at Defendant JPMorgan averred that RMAs would talk to each other primarily in-person or by telephone, working to avoid communication methods like e-mail and Bloomberg messages that could easily be searchable.[28]

98.     Indeed, banks used Bloomberg messages to coordinate and fix the price of other bonds too.  On April 28, 2021, the European Commission, the executive wing of the European Union, announced that it was fining Bank of America Merrill Lynch €12.6 million for taking part in a cartel in the secondary trading market within the European Economic Area of Supra-sovereign, Sovereign and Agency (SSA) Bonds denominated in US Dollars.[29]  The European Commission concluded the banks' "traders, who were in direct competition, typically logged into multilateral chatrooms or bilateral chatrooms on Bloomberg terminals" and "provided each other with recurring updates on their trading activities, exchanged commercially sensitive information, coordinated on prices shown to their customers, or to the market in general and aligned their

---

[27] *Philadelphia v. BoA* Compl. ¶ 105.

[28] *Id.* ¶ 106.

[29] Foo Yun Chee, *BAML, C.Agricole, C.Suisse fined $34 mln over bond cartel*, REUTERS (Apr. 28, 2021, 4:49AM PDT), *available at* https://www.reuters.com/business/finance/eu-fines-bank-america-merrill-lynch-c-agricole-credit-suisse-285-mln-euros-2021-04-28/; European Commission, *Antitrust: Commission fines investment banks € 28 million for participating in SSA bonds trading cartel*, Press Release (Apr. 28, 2021). *available at* https://ec.europa.eu/commission/presscorner/detail/en/ip_21_2004.

trading activities on the secondary market for these bonds."[30]  This unlawful coordination—carried out through Bloomberg messages—occurred *during the Class Period*, between January 2010 and March 2015.[31]

99.     Certain Defendants—including Defendants Barclays Bank PLC, Bank of America Corporation, Bank of America, N.A., Citigroup Inc., Citibank N.A., Citigroup Global Markets Inc., Citigroup Global Markets Limited, The Royal Bank of Canada, and RBC Capital Markets, LLC—were also named defendants in a class action alleging anticompetitive behavior in the USD SSA Bonds market.[32]  The banks' unlawful conduct in the USD SSA Bonds market ran from at least January 2009 through December 2015, coinciding with the Class Period alleged in this Complaint.

100.     Defendants also could, and did, coordinate using third-party pricing services. J.J. Kenny Drake Inc. is an example of one of those third-party pricing services.  RMAs from all of the major banks (including from Barclays, Goldman Sachs, JPMorgan, Merrill Lynch, Bank of America, Citi, Morgan Stanley, and Wachovia) used J.J. Kenny short-term index services during the Class Period.  These indexing services did not simply provide information on historical VRDO rates.  They also involved an exchange of information about Defendants' views of, and plans for, future VRDO rate-setting.  Because VRDO pricing resets typically took place on Tuesday and Wednesday of each week, employees of these third-party pricing services, including Joseph Luparello at J.J. Kenny, would call RMAs on Monday, Tuesday, and

---

[30] European Commission, *Antitrust: Commission fines investment banks € 28 million for participating in SSA bonds trading cartel*, Press Release (Apr. 28, 2021). *available at* https://ec.europa.eu/commission/presscorner/detail/en/ip_21_2004.

[31] *Id.*

[32] *In re SSA Bonds Antitrust Litig.*, No. 1:16-cv-03711-ER, Dkt. No. 506 (S.D.N.Y. Nov. 13, 2018).

Wednesday of each week to ask about their future plans for VRDO rate-setting over the following days.  These phone calls would be made to RMAs at Barclays, Goldman Sachs, JPMorgan, Merrill Lynch, Bank of America, Citi, Morgan Stanley, Wachovia, Wells Fargo, and others.  Luparello would begin making phone calls around 8:00 a.m., and during each call would ask the RMAs, for example, "Where are you going to be on your weekly high grades today?"  Luparello was specifically asking where the RMAs planned to reset their weekly rates later that day for their "high grade" VRDOs (*i.e.*, VRDOs that received higher ratings from the credit rating agencies and were believed to be a lower default risk).  These third-party services thus enabled Defendants to adjust their planned VRDO rates after first obtaining information about their so-called competitors' plans for VRDO rates in the immediate future.[33]

101.    Defendants provided this information to Luparello and others like him with the knowledge and common understanding that other Defendants were doing the same.  After he had surveyed Defendants, Luparello would then call other RMAs to ask the same question.  These phone calls would typically end around 9:15 a.m., and following discussion with all of these RMAs, Luparello would send out a single email about 15 minutes later to all recipients of the pricing index—including Defendants—reporting the average planned VRDO rate that the RMAs had communicated to him.  For at least part of the Class Period, Luparello's email included the names of all the recipients in the "to" line; this allowed Defendants to know who else was receiving the information.  These average rates operated as a mechanism by which Defendants could communicate and coordinate future plans for their high-, intermediate-, and low-grade VRDO rates before Defendants set those rates later that day.[34]

---

[33] *Philadelphia v. BoA* Compl. ¶¶ 107, 108.

[34] *Id.* ¶ 109.

102.    Luparello would also make phone calls to some banks to report the results.  After the RMAs had received the morning price index email, Luparello would sometimes make a second round of phone calls to the RMAs in the afternoon (*i.e.*, when they had a more informed view of their plans for setting rates for the subsequent day).  After these phone calls and after receiving the pricing index email that provided the average planned VRDO rate, the RMAs had until the end of the day to submit their final VRDO rates to EMMA, a website run by the Municipal Securities Rulemaking Board ("MSRB"), which serves as the official source for municipal securities data and disclosure documents.  This daily process provided Defendants advance notice if their planned rates were out of line with other Defendants' plans; this gave Defendants an opportunity to change their plans before finalizing their rates at the end of the day.[35]

103.    Defendants also could use the J.J. Kenny rate index to coordinate their rates and resets *before* printing the final rate and to police one another to ensure that no conspirator cheated the cartel.  Although the index's information allowed Defendants to coordinate without having to speak to one another directly, a high-ranking industry insider confirmed that Defendants regularly used the index's results to explicitly collude about their rates in direct communications.  After receiving the J.J. Kenny index results in the morning (before rate resets were finalized), personnel on Defendants' sales desks routinely would call salespeople at other Defendant banks to confirm their rates to be reset later that day would be in line with the index.[36]

104.    Defendants continued to pay for access to the J.J. Kenny pricing index service even after the Public Securities Association (now known as SIFMA) made actual historical

---

[35] *Philadelphia v. BoA* Compl. ¶ 110.

[36] *Id.* ¶ 111.

pricing information available to the market in the 1990s.  J.J. Kenny continued offering the

pricing index until at least 2012.[37]

105.    In furtherance of the conspiracy, Defendants also used computerized platforms

that permitted users to share information instantaneously and without direct communication.

"Dalcomp" is a computer software system, later acquired by Ipreo, that helped RMAs manage

their VRDO programs.  This program offered, *inter alia*, a Variable Rate Trading System

("VRTS") and a "Position Monitor" designed for use with "variable interest rate securities."

Ipreo touted in marketing materials that its platform offered the "[a]bility to show inventory to

other firms on our system."  Such systems allowed Defendants to perpetuate the coordination

without having to make telephone calls.  Defendants shared their inventory levels with the other

Defendants and, thereby, telegraphed any change to the base rate.  With this base-rate

information, Defendants could easily infer and communicate all other rates without risking the

conspiracy being detected.[38]

106.    Defendants' agreement to refrain from competing on rates in this manner was

designed to maximize the likelihood that existing holders of VRDOs would not tender their

bonds back to Defendants.  By keeping VRDOs in the hands of existing holders, Defendants

could avoid the obligations and risks that would be triggered if an investor exercised a VRDO's

"put" feature and tendered the bond to a LOC provider.  Moreover, Defendants manage several

of the largest MMFs in the world.  According to Crane Data, Defendants JPMorgan, Goldman

Sachs, and Wells Fargo all manage MMFs in the top 15 MMFs in terms of assets under

management and other Defendants also either manage their own tax-free MMFs or have

---

[37] *Philadelphia v. BoA* Compl. ¶ 112.

[38] *Id.* ¶ 113.

partnered with third-party managers.  Defendant Morgan Stanley effectively ended its VRDO investments shortly after the collusion ended.  Such funds benefited by the inflated rates set by Defendant RMAs on VRDOs in their portfolios, thereby benefiting Defendants and their affiliates as well.[3940]

107.    If an investor tendered a VRDO to a RMA, the RMA was obligated to spend the time and resources to remarket the bond to new investors and to hold the tendered VRDO in inventory in the meantime, incurring negative carry (*i.e.*, losses).  If the RMA ultimately failed to find a buyer for the tendered VRDO and the RMA's affiliate was also the liquidity provider (as was often the case), the LOC provider was obligated to repurchase the bond and to assume the risk that the issuer will default on its payments as well as regulatory capital charges associated with holding the VRDOs.  Keeping VRDO rates artificially high largely ensured for Defendants that investors would continue to retain their VRDO holdings—at greater costs to Plaintiff and members of the Class—even if there may have been alternative investors who would be willing to purchase the same bonds at a lower interest rate.[41]

108.    A former head of the VRDO desk at Defendant JPMorgan explained that RMAs "would set the rate wherever they had to keep the paper off their balance sheet—and you could understand them needing other banks to set the same rate otherwise the issuer would move their business.  It was a challenge for them to be fair."  If a VRDO was tendered, Defendants were at least able to earn the higher interest rates generated by the conspiracy while the VRDO remained on their books.[42]

---

[39] *Philadelphia v. BoA* Compl. ¶¶ 91, 92.

[40] *Id.* ¶ 114.

[41] *Id.* ¶¶ 114, 115.

[42] *Id.* ¶ 116.

109.    But for Defendants' coordinated efforts, they could not keep their rates high. Issuers, who are able to see the rates obtained by other issuers, would otherwise push their RMAs to obtain the lowest rate possible under threat of switching to a different agent of similar size and resources.  Defendants, the largest and most creditworthy RMAs in the market, made certain that all other Defendants "stayed in line" and, through their conspiracy, ensured that issuers would not know they could obtain lower rates from the other major RMAs.  For most issuers, Defendants were the only acceptable RMAs due to their size, touted experience, and credit ratings.  As a result, RMAs other than Defendants did not pose a realistic threat to the conspiracy; Defendants only needed to ensure that others in the conspiracy did not cheat.[43]

110.    As a direct and proximate result of Defendants' conspiracy, Plaintiff and members of the Class were forced to pay artificially inflated interest rates for VRDOs that they issued. Defendants, meanwhile, continued to collect fees for remarketing services that Plaintiff and other Class members never received.[44]

111.    Since late 2015, government authorities have investigated Defendants for their practices in the market for VRDO remarketing services.  The government's investigation was based on facts that a whistleblower brought to authorities' attention.  In November 2015, the whistleblower filed a whistleblower complaint with the Securities and Exchange Commission ("SEC"), alleging that RMAs—including Defendants—engaged in a scheme to defraud issuers by keeping VRDO rates artificially high despite those RMAs' obligation to do the opposite.

---

[43] *Philadelphia v. BoA* Compl. ¶ 117.

[44] *Id.* ¶ 119.

These allegations were primarily based on the whistleblower's extensive analysis of economic data.[45]

112.    In response, the SEC immediately began an investigation into the industry.  In late 2015 and/or early 2016, the SEC contacted, among others, RMAs at JPMorgan, Citi, Wells Fargo, and Bank of America regarding their conduct in the VRDO market.[46]

113.    The SEC proceeded to open a formal investigation; this investigation remains active.[47]

114.    In September 2018, the Bond Buyer reported that the SEC was conducting a "sweep" of the major RMAs in the VRDO market, including Defendants.  The SEC sent Defendants and other RMAs letters seeking information, including documents, concerning their remarketing and rate-resetting practices to determine whether they engaged in "fraudulent practices or collusion in the resetting of VRDO or variable rate demand note rates."[48]

115.    The whistleblower met and shared its data analysis with the DOJ in August 2016.  The DOJ consequently authorized an investigation into Defendants' remarketing practices.  That investigation remains active.[49]

---

[45] *Philadelphia v. BoA* Compl. ¶ 120.

[46] *Id.* ¶ 121.

[47] *Id.* ¶ 122.

[48] *Id.* ¶ 122 (citing Lynn Hume, SEC conducting sweep of top 12 VRDO remarketers, THE BOND BUYER (Sept. 6, 2018), https://www.bondbuyer.com/news/sec-conducting-sweep-of-top-12-vrdoremarketers).

[49] *Id.* ¶ 123.

## IV.   PLAINTIFF'S ECONOMIC ANALYSIS CONFIRMS DEFENDANTS' UNLAWFUL CONSPIRACY TO INFLATE VRDO INTEREST RATES

116.   Plaintiff conducted a sophisticated econometric analysis to determine whether actual VRDO rates during the Class Period corresponded to expected VRDO rates, or whether they were artificially inflated due to Defendants' collusive activity.  This analysis showed, with a very high degree of confidence, that VRDO rates were artificially inflated during the Class Period.

117.   To conduct this analysis, Plaintiff first analyzed the spreads between benchmark financial products that are similar to VRDOs (7- and 30-day taxable commercial paper, issued by both financial companies and non-financial companies) and VRDOs, and then compared the spreads between those benchmarks and VRDO rates during the Class Period against the spreads between those benchmarks and VRDO rates before and after the Class Period.  Even after accounting for all possible legitimate economic reasons that there might be a difference in spreads during those periods, the spreads show that VRDO rates were artificially inflated during the Class Period.

118.   Plaintiff then constructed regression models, primarily using data from the same benchmark financial products and from VRDO rates themselves, to determine what VRDO rates would have been during the Class Period absent Defendants' collusive activities.  The regression models also considered other factors, such as the relationship between longer-term AAA corporate debt and AAA municipal debt, to confirm that there was no structural change in investors' appetites for municipal debt products during the Class Period.  The conclusion of the regression analyses shows that VRDO rates were higher than they should have been for reasons that valid economic factors cannot explain.

119.    Finally, the economic analysis also shows that Defendant RMAs also engaged in "clustering," where they reset VRDO rates to large groups of VRDOs together instead of fulfilling their contractual duty and fiduciary obligation to obtain the lowest possible interest rates for VRDO issuers.

A.    **Defendants Caused VRDO Rates to Be Significantly Inflated Compared to Rates of Similar Financial Products During the Class Period.**

120.    The risk profiles of VRDOs and certain other financial products are very similar, and therefore, VRDO interest rates and the interest rates of these other financial products tend to be close and also to move in unison.  For example, VRDOs and 7-day taxable commercial paper have very similar risk profiles in that both are (a) very short-term products, with rates resetting or "rolling over" on a weekly basis, and (b) backed by large financial institutions, so the credit risk for these products is dictated by the backing financial institution's creditworthiness, not the issuer's.

121.    The key difference between VRDOs and 7-day taxable commercial paper lies in their disparate tax treatments: VRDOs are typically not subject to federal tax, while 7-day taxable commercial paper is.  Therefore, VRDO rates should be significantly lower than 7-day taxable commercial paper rates to account for this disparate tax treatment.[50]  However, as displayed in **Figure 1** and **Figure 2**, due to Defendants' collusive activity, this was not the case

---

[50] *See* Lynn Hume and Kyle Glazier, *Banks, broker-dealers accused of widespread fraud and collusion over VRDO rate resets*, THE BOND BUYER (Apr. 10, 2018), *available at* https://www.bondbuyer.com/news/banks-broker-dealers-charged-with-widespread-fraud-and-collusion-over-vrdos; *see also* Wells Fargo, A Primer on Variable-rate Demand Notes, at 4, *available at* https://www.wellsfargofunds.com/assets/pdf/fmg/icm/primer_vrdns.pdf.

during the Class Period.



*Figure 1*



*Figure 2*

122.    As displayed above, VRDO rates are significantly lower than 7-day taxable commercial paper rates before and after the Class Period.  However, during the Class Period, VRDO rates are significantly higher than 7-day taxable commercial paper rates (generally

between 20 and 300 basis points higher), even though from an economic standpoint they should be *lower* due to their favorable tax treatment.

123.    Even when the disparate tax treatment is incorporated into the economic analysis used in comparing VRDO rates and 7-day taxable commercial paper rates (by factoring in the effect that federal tax would have on VRDOs, which would render them as economic twins to 7-day taxable commercial paper), the inflation of VRDO rates is still apparent.  **Figure 3** and **Figure 4** below demonstrate how the VRDO rates were still significantly higher than 7-day taxable commercial paper rates even after correcting for tax effects.



*Figure 3*



*Figure 4*

124.     Figure 3 and Figure 4 show that before and after the Class Period, VRDOs and 7-day taxable commercial paper had roughly the same tax-adjusted interest rates.  However, during the Class Period, tax-adjusted VRDO rates were significantly inflated, with a peak inflation of nearly 30% higher than commensurate 7-day taxable commercial paper rates.

125.     When other benchmarks are compared to tax-adjusted VRDO rates, such as the federal funds rate, the auction rate securities rates, or the overnight repurchase agreement (the "repo") rates, the conclusion from the analysis is the same: VRDO rates were inflated compared to other securities with similar characteristics and risk factors.  **Figure 5** below compares tax-adjusted VRDO rates with several benchmarks, and shows how VRDOs were inflated against a variety of key interest rates.  The line plotted in Figure 5 shows tax-adjusted VRDO rates minus each of those other benchmarks; again, from an economic standpoint—and absent Defendants'

collusive activities—the expected difference would be nearly zero.



*Figure 5*

126.    A bar chart also provides a simple way to visualize how the spreads between

VRDO rates and the benchmarks were inflated during the Class Period.  The orange bars in

**Figure 6** show the difference between tax-adjusted VRDO rates and the identified benchmark

during the Class Period, while the blue bars show the difference between tax-adjusted VRDO

rates and the identified benchmark after the class period.  It is apparent from the graph that

Defendants' collusive activities caused the spreads to be larger—by about 30%—during the

Class Period than they were after.



*Figure 6*

127.    The bottom line—that is apparent despite VRDOs' tax benefits and no matter which benchmarks VRDOs are compared with—is that VRDO rates were inflated during the Class Period vis-a-vis the interest rates of other securities with similar risk, tenor, and creditworthiness profiles.

**B.    Modeled VRDO Rates Are Consistently Lower Than Actual Rates.**

128.    In addition to comparing VRDO rates to other rates, Plaintiff undertook an economic analysis to determine what interest rates VRDO RMAs would have set absent their collusive activity.  This set of analyses confirms that VRDO rates were inflated above the rates at which underlying interest rates and market conditions suggested that they should have been set.

129.    Four different rates were used in four separate regression analyses to determine what VRDO rates would have been absent Defendants' collusion: 7- and 30-day AA taxable commercial paper rates for both financial and non-financial companies.  As discussed above,

these instruments share many important features with VRDOs; the tax-exempt nature of VRDOs was also taken into account when conducting these analyses.

130.    As seen in **Figure 7**, **Figure 8**, **Figure 9**, and **Figure 10**, the actual VRDO rates tracked the modelled VRDO rates very closely both before and after the Class Period.  However, during the Class Period, actual VRDO rates were significantly inflated when compared to actual VRDO rates.



*Figure 7*



*Figure 8*



*Figure 9*



*Figure 10*

131.    The charts above show that actual VRDO rates rarely differed by more than 1% from the modelled VRDO rates before and after the Class Period.  However, during the Class Period, the actual VRDO rates differed wildly from the modelled rates, and, the vast majority of the time, the rates differed in a direction that damaged Plaintiff and members of the Class.  If not for Defendants' collusive activity, the actual rates and the derived rates would have remained nearly the same during the Class Period.  This relationship holds true for each of the four different taxable commercial paper rates that drives the regression equation from which the modelled VRDO rates were derived.

C.    **VRDO Rates Show Significant "Clustering" During the Relevant Period.**

132.    Defendants' illegal conspiracy to collude and not to compete is also evidenced by examining the high degree of "clustering" in VRDO rates, where VRDOs from different issuers cluster together at the exact same interest rate, and also tend to move together when interest rates fluctuate.  The clustering pattern abruptly stops in early 2016—the same time that VRDO rates

reverted back to normal—when regulatory authorities first began investigating Defendants' conspiracy.

133.   To conduct the analysis, Plaintiff calculated the historical changes in each VRDO's rate from one week to the next.  Then, for each three-month period, Plaintiff compared each VRDO's rate changes with the rate changes of each other VRDO.  When a VRDO's rates changed in unison with the rates of another VRDO at least 80% of the time, Plaintiff would then group those VRDOs together as a cluster.  The analysis showed that VRDO rates were frequently clustered in groups of five VRDOs, ten VRDOs, twenty VRDOs, or even more.

134.   **Figure 11** demonstrates how Defendants' clustering activity increased over the Class Period, showing that clusters of at least five VRDOs, at least ten VRDOs, and at least twenty VRDOs all increased until the 2016 regulatory investigations began.  The clustering activity peaked towards the end of the Class Period, when the RMAs grouped over 90% of all VRDOs into clusters for the purposes of rate resetting, instead of taking each VRDO's individual

characteristics into account when conducting rate resets.



*Figure 11*

135.    Clustering was pervasive throughout the Class Period, which is indicative of an

agreement amongst Defendants not to compete with each other in the setting of VRDO rates.  Of

course, once the regulatory investigations began, Defendants ceased their collusive activities, and

the clustering abated almost instantly.

136.    **Figure 12** presents the same information in a bar chart, showing that, for

example, nearly 50% of all VRDOs were clustered in any given three month period during the

Class Period, but that only about 22% of VRDOs were clustered in any given three month period

after the Class Period.



*Figure 12*

137.    Clustering is meaningful for two reasons.  First, it provides further evidence of Defendants' conspiracy: Defendants colluded to ensure that no VRDO issuers would take their remarketing business to another RMA by agreeing that all RMAs would set rates within the same clusters.  Second, clustering shows how Defendants were willing to violate both their contractual and fiduciary duties to Plaintiff and Class members to reset their VRDOs at the lowest possible rates; instead of doing so, Defendants just lumped their VRDOs into whatever clusters were convenient, and let the cluster dictate the rates.

## V.    DEFENDANTS BREACHED THEIR CONTRACTUAL OBLIGATIONS AND FIDUCIARY DUTIES TO PLAINTIFF

138.    As mentioned above, an RMA's obligations can be found in three types of documents: a Remarketing Agreement, a Bond Indenture, and Official Statements.  Defendants

breached their obligations to Plaintiff and members of the Class under their Remarketing Agreements.

139.    As alleged and averred above, Remarketing Agreements required Defendants to actively remarket VRDOs, achieving the lowest rate interest at which there were buyers in the VRDOs market.  For example, Defendant JP Morgan, in its March 1, 2008 Remarketing Agreement with SANDAG, acknowledged "that it has a duty to determine the interest rate" and "to use its best efforts to remarket the [VRDOs] to prospective holders."

140.    Defendants, however, did not comply with this requirement.  Instead of actively remarketing and setting VRDO rates to the lowest possible interest rate, Defendants conspired to keep interest rates on VRDOs artificially high to prevent investors from exercising their put rights.  As a result, Plaintiff and Class members paid, and Defendants continued to collect, remarketing fees to Defendants for breaching their obligations.

141.    For instance, Defendants would reset tens, hundreds, or thousands of VRDOs in a process that could take less than thirty minutes, by simply changing the Defendant's "base" rate up or down.  Defendants would do this rather than give attention to each VRDO and its rate on a weekly basis.  A former RMA from Wells Fargo explained that he managed hundreds of daily re-sets of VRDOs, and approximately 1,200-1,300 weekly re-sets.  Each time Wells Fargo reset VRDO rates, he would mechanically reset the rate for hundreds of VRDOs all at once.  This employee admitted that the vast majority of issuers had no understanding of how he actually performed his rate re-sets.[51]

142.    A former Managing Director at JPMorgan represented that JPMorgan's RMA would apply the same change in interest rate to large groups of VRDOs in one stroke, in a

---

[51] *Philadelphia v. BoA* Compl. ¶ 155.

process that would take approximately 30 minutes.  The RMA would do this instead of giving individual attention, consideration, and analysis to each VRDO to determine the lowest interest rate that could be assigned.  The former JPMorgan Managing Director also represented that he does not believe issuers understood their VRDO rates were being reset in this manner, and that there was a significant difference between the high quality of service advertised in JPMorgan's marketing materials and the low quality of remarketing activities that this Defendant was actually performing.[52]

143.    Defendants did not prioritize obtaining the lowest possible interest rate for issuers' VRDOs.  Instead, they focused on avoiding having to carry VRDOs in their inventory, especially as the banks' costs of carry associated with VRDOs grew during and after the 2008 financial crisis as the credit markets lost liquidity, funding costs increased, and financial regulations tightened their grip on Wall Street.  A former Managing Director at JPMorgan relayed that the VRDO team's mandate or mission was not to get the lowest possible rates for its issuer clients, but to ensure inventory left the bank's balance sheet as quickly as possible.  A former Wells Fargo RMA represented that, particularly at times of the year when Wells Fargo expected increased put backs from investors, the Wells Fargo RMA was instructed by supervisors to "make sure [the RMA] was cheap on this week's reset" (*i.e.*, ensure that the RMA reset the VRDO interest rates at a high level) so that Wells Fargo would not have to hold VRDOs in inventory.  Such a result could cause Defendants significant losses.  These types of instructions would typically come around the April 15 tax deadline, the end of the year, and when market anomalies were causing investors to tender VRDOs at a higher rate than normal.[53]

---

[52] *Philadelphia v. BoA* Compl. ¶ 156.

[53] *See id..* ¶ 157.

144.     During the Class Period, Defendants' VRDO rates were artificially and significantly inflated, set at levels higher than they should have been based on reasons that valid economic factors could possibly explain.  Defendants' Remarketing Agreements with Plaintiff and Class members required them to use their judgment to set, reset, and remarket VRDO interest rates to the lowest possible rate.  Defendants breached those contractual obligations, causing significant injury to Plaintiff and Class members.

145.     Defendants also owed Plaintiff and members of the Class fiduciary duties, including under 15 U.S.C. § 18o-4(c)(1) and California law.  Defendants provided Plaintiff and members of the Class advice concerning municipal securities and other financial matters, and their advice were supposedly given to benefit and further the financial goals of Plaintiff and members of the Class.

146.     Defendants breached their fiduciary duties, however, by prioritizing and putting their interests above Plaintiff's and the Class members'.  Among other things, Defendants entered into Remarketing Agreements with Plaintiff and Class members knowing that Defendants would not seek the lowest VRDO rates and, instead, would set artificially high rates.

## VI.     DEFENDANTS' CONSPIRACY INJURED PLAINTIFF AND CLASS MEMBERS

147.     As discussed above, in the midst of the 2008 financial crisis—which was caused by many of the same banks that conspired with respect to VRDOs—California faced a massive budget shortfall.  Government workers across the state were furloughed and government budgets were stretched to their breaking point.  In January 2008, California's governor declared a fiscal emergency.  By the end of that year, the governor was calling for a 10% cut in state payrolls.

148.     This financial disaster impacted all California cities.  San Diego, for example, reported a $43 million budget deficit in October 2008.  Los Angeles faced a budget shortfall of

more than $200 million.  Sacramento's shortfall was over $50 million.  These financial issues were particularly acute for California cities because, as experts who have studied these issues have noted, local governments have lower revenues in California than in other states, but local government expenditures are higher.  This is at least in part the product of initiatives in California that have severely constrained local revenue sources.

149.    As a result of the financial crisis, California cities were in dire financial straits. They faced unprecedented budget issues and could no longer finance infrastructure projects that, if allowed to move forward, could have helped put these cities on the road to economic recovery.

150.    It is against this backdrop that Defendants' concealed conspiracy must be considered; Defendants took advantage of California municipalities—and, by extension, the citizens of the State of California—when they were most in need of these banks to fulfill their obligations.  These municipalities needed access to funds more than ever, but Defendants were manipulating financial instruments in order to deprive cities of key assets.  California government entities use debt financing by way of bonds (and other debt instruments like interest rate swaps) to finance major projects that annual revenue sources are insufficient to cover. During the financial crisis, which resulted in a drop in tax revenue, this debt financing was essential to fund California government projects.

151.    The injury Plaintiff and Class members have suffered is an antitrust injury, type of which the antitrust laws are, and were, intended to deter and punish.

152.    Defendants' unlawful conspiracy inflicted severe financial harm to Plaintiff and members of the Class.  Defendants' unlawful conspiracy also restrained competition in the market for remarketing services.  The direct consequences of this conspiracy included inflated

profits for Defendants for remarketing services that they never provided to Plaintiff or Class members through supra-competitive rates for Plaintiff's and Class members' VRDOs.

153.    The conspiracy alleged herein had, and has, among other things, several common effects.  Plaintiff and members of the Class were deprived of free and open competition in the VRDO remarketing-service market.  Competition for establishing the interest rates that Plaintiff and other Class members paid was unlawfully restrained, suppressed, and eliminated.  Therefore, Plaintiff and members of the Class paid VRDO interest rates that were fixed and/or stabilized at inflated, supra-competitive levels.  Plaintiff and Class members incurred, and will incur, expenses related to the inflated rates (*e.g.*, inflated and supra-competitive fees for accounting, remarketing agents, and letters of credit).

154.    Plaintiff and the Class have suffered several millions of dollars in damages as a result of Defendants injuring Plaintiff and each member of the Class through a common scheme.

155.    By reason of Defendants' violations of the California Cartwright Act and the Sherman Act, as alleged and averred herein, Plaintiff and Class members have sustained injury to their businesses and/or property that consist of Plaintiff and Class members paying Defendants supra-competitive interest rates for VRDOs as a result of Defendants' unlawful conspiracy to restrain trade.

## VII.    **DEFENDANTS' CONCEALMENT OF THEIR UNLAWFUL CONDUCT**

156.    Defendants in this case were successful in convincing Plaintiff that they were fulfilling their obligations under the Remarketing Agreements and living up to their fiduciary duties.  Defendants took affirmative steps to conceal their illegal conduct from Plaintiff and were successful in doing so.  Accordingly, any statutes of limitation that would apply to Plaintiff's claims have been tolled due to Defendants' illegal concealment of their actions.

157.     As discussed above, and as is evident from the conversations and emails between representatives of Defendants, Defendants knew that maintaining the secrecy of their conspiracy was paramount, and that the conspiracy would fail if it were to be exposed.  For this reason, representatives of Defendants only had these discussions via email, phone call, or other private forums where they could be sure the discussions would stay behind closed doors and never see the light of day.  Defendants took these steps because they knew that if they failed to conceal their conduct, their conspiracy would fail.

158.     Defendants made inaccurate representations in their statements to borrowers, including in their marketing materials, that were designed to maintain the secrecy of their conspiracy.[54]  However, despite their promises, Defendants never intended to reset interest rates to the lowest rates that the market would bear—but they knew they had to mislead Plaintiff into thinking they would to maintain their conspiracy.

159.     Defendants hid their conspiracy from the issuers.  For example, a former senior RMA at one Defendant acknowledged that RMAs would engage in "window dressing": they would temporarily lower rates on a single issuer before a meeting or making a pitch for more business.  A former senior RMA at JPMorgan confirmed this practice, averring that a RMA, when engaged in this "window dressing" practice, would frequently take those VRDOs back onto its own balance sheet to hide the lower rate and not to "disrupt the market."  This "window dressing" practice demonstrates that the RMAs could have obtained lower rates for issuers (as was the remarking agreements required), but did not.  Further, the practice of hiding the low

---

[54] *Philadelphia v. BoA* Compl. ¶ 165

rates from the market shows that Defendants knew that the conspiracy could be endangered by any failure to publicly "stay in line."[55]

160.    It took a perfect storm of evidence to uncover Defendants' illegal conduct, including a massive government investigation and a high-ranking VRDO insider deciding to blow the whistle on Defendants' VRDO practices.  Were it not for the full weight of the American criminal justice apparatus bearing down on Defendants in 2016, it is likely that their conspiracy would have remained hidden to this day. Instead, as demonstrated by the economic analysis above, Defendants wisely decided to cease their illegal conduct once the government caught wind of it.  Without the government's intervention, it is highly likely that Defendants would still be engaging in—and successfully concealing—their conspiratorial conduct.

161.    Defendants attempted to actively conceal their collusive and illegal conduct and they were largely successful in doing so.  Because of this concealment, all statutes of limitation that would otherwise be applicable to Plaintiff's claims have been tolled.

## VIII.   A CLASS ACTION IS THE BEST METHOD TO RESOLVE THESE CLAIMS

162.    Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), Plaintiff seeks to hold Defendants accountable for their unlawful conduct and to seek damages not just on its own behalf but also on behalf of those similarly situated in California (the "Class").  Plaintiff brings this action on its own behalf and as a class action on behalf of the Class defined as:

> All persons and entities in or based in California that paid interest charges or fees related to VRDOs for which Defendants either served as a RMA or LOC provider, or both, from February 1, 2008 to June 30, 2016.  The Class excludes Defendants and Defendants' employees, officers, directors, management, parent companies, subsidiaries, affiliates, and co-conspirators, as well as the United States federal government.

---

[55] *Philadelphia v. BoA* Compl. ¶ 118.

163.   The "Class Period" is from February 1, 2007 to June 30, 2016.

164.   The Class satisfies the threshold requirements for certifying a class under Federal Rule of Civil Procedure 23.

165.   ***Numerosity***.  Plaintiff's investigation has not revealed the exact number of Class members, but Plaintiff is informed and believes, and on that basis alleges, that the number is in the hundreds.  Joinder is impractical with this number of Class members.

166.   ***Adequacy of Representation***.  Plaintiff is represented by experienced counsel who have successfully prosecuted numerous cases involving financial improprieties.  Plaintiff is assisted by experts who understand the VRDO market, as well as the municipal debt market more broadly.  Plaintiff, and its counsel, have the financial wherewithal to vigorously litigate this case for years and to completion.  Plaintiff can and will fairly and adequately represent the interests of the Class and has no interest that is adverse or antagonistic to, or in conflict with, the Class's interests.

167.   ***Typicality***.  Plaintiff is a member of the Class, its issuances of VRDOs are representative of those of the Class members, and its claims are typical of the claims of the Class members.  Plaintiff's interests coincide, are aligned, and are not adverse or antagonistic with the Class's interests.  Plaintiff will adequately and fairly protect and represent the Class's interests. The same wrongful conduct of Defendants damaged Plaintiff and the Class members.  By prosecuting and proving its claims against Defendants, Plaintiff will prosecute and prove the other members of the Class's claims against Defendants.

168.   ***Commonality and Predominance***. There are questions of law or fact common to all Class members' claims that will predominate over any individualized issues or questions that

may affect only individuals members.  The common questions of law and fact that must be answered to resolve all of the Class's claims include, but are not limited to:

(a)    Whether Defendants illegally conspired to set VRDO interest rates at an artificially high level in violation of the Sherman Act;

(b)    Whether Defendants illegally conspired to set VRDO interest rates at an artificially high level in violation of the Cartwright Act;

(c)    The identity of the co-conspirators;

(d)    The duration of the conspiracy;

(e)    The nature and scope of the conspiracy;

(f)    The acts that Defendants and the co-conspirators conducted to create and further the conspiracy;

(g)    Whether Defendants and the co-conspirators fraudulently concealed the conspiracy's existence from Plaintiff and other Class members;

(h)    Whether injunctive and equitable relief is appropriate for Plaintiff and the Class;

(i)    Whether Defendants breached their contractual obligation to members of the Class to set VRDO interest rates at the lowest level that would allow the VRDOs to trade at par;

(j)    Whether Defendants charged excessive RMA fees;

(k)    Whether Defendants charged excessive LOC fees;

(l)    Whether Defendants breached their fiduciary duties owed to Plaintiff and the Class members;

(m)     Whether Defendants' acts and conduct constitute unlawful business acts or practices prohibited by California Business and Professions Code § 17200;

(n)     Whether Defendants' acts and conduct constitute unfair business acts or practices prohibited by California Business and Professions Code § 17200;

(o)     Whether Defendants' acts and conduct constitute fraudulent business acts or practices prohibited by California Business and Professions Code § 17200;

(p)     Whether Defendants' unlawful, unfair, or fraudulent business acts or practices unjustly enriched Defendants;

(q)     Whether Plaintiff's and the Class's damages were caused by Defendants' unlawful conduct;

(r)     The appropriate method to measure the damages that Defendants caused Plaintiff and the Class; and

(s)     The appropriate measure of damages that Defendants caused Plaintiff and the Class.

169.    Questions of law and fact common to the Class members predominate over questions that may affect only individual or specific Class members.  A common methodology of determining, measuring, and calculating damages as a whole are appropriate here as Defendants' conduct and actions are generally applicable to the Class.  Plaintiff and Defendants entered into RMAs during the relevant Class period that contain similar material obligations.  Plaintiff's interests coincide, and are not adverse to, the other Class members'.

170.    *Superiority*.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable and one for which

records should exist in the files of Defendants or should be accessible to Defendants. Prosecution as a class action will eliminate the possibility of repetitious litigation, and treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously and efficiently, without the duplication of effort and expense that numerous individual actions would engender.  The prosecution by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.  Injunctive and declaratory relief and monetary damages are appropriate as to the Class as a whole because Defendants have acted or refused to act on grounds generally applicable to the Class.  Plaintiff and members of the Class have been injured and damaged in an amount to be determined according to proof.  The benefits of proceeding through a class action, including providing injured persons or entities a method to obtain redress on claims that otherwise could not be practicably pursued on an individual basis, substantially outweigh any potential difficulties arising from managing a class action.

171.    Plaintiff and the Class have a high degree of cohesion.  Plaintiff is not aware of any special difficulty that would be encountered with respect to the maintenance of this action such that maintenance as a class action would be precluded.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Violation of California Cartwright Act)**

172.    Plaintiff hereby incorporates and re-alleges each preceding and succeeding paragraph as though fully set forth herein.

173.    Defendants, along with their unnamed co-conspirators, entered into and engaged in a continuing unlawful trust for the purpose of unreasonably restraining trade in violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16720, *et seq.*

174.    Plaintiff has suffered injury to its business and property as a direct, substantial, material, reasonably foreseeable, and proximate effect and result of Defendants' violation of the Cartwright Act.

175.    Plaintiff is entitled to treble damages for Defendants' violations of the Cartwright Act, Cal. Bus. & Prof. Code § 16750(a).

176.    Plaintiff is also entitled to an injunction against Defendants, preventing and restraining the illegal conduct alleged and averred above, under the Cartwright Act, Cal. Bus. & Prof. Code § 16750(a).

## SECOND CLAIM FOR RELIEF
### (Violation of Sherman Act)

177.    Plaintiff hereby incorporates and re-alleges each preceding and succeeding paragraph as though fully set forth herein.

178.    Defendants, along with their unnamed co-conspirators, entered into and engaged in a conspiracy and/or combination in an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

179.    Plaintiff has suffered injury to its business and property as a direct, substantial, material, reasonably foreseeable, and proximate effect and result of Defendants' violation of the Sherman Act within the meaning of the Clayton Act, 15 U.S.C. § 15.

180.    Under the Clayton Act, Plaintiff is entitled to treble damages for Defendants' violations of the Sherman Act.

181.    Plaintiff also is entitled to an injunction against Defendants, preventing and restraining the illegal conduct alleged and averred above, under the Clayton Act, 15 U.S.C. § 16.

**THIRD CLAIM FOR RELIEF**
**(Violations of California Unfair Competition Law**
**(Cal. Business and Professions Code § 17200))**

182.    Plaintiff hereby incorporates and re-alleges each preceding and succeeding paragraph as though fully set forth herein.

183.    The California Unfair Competition Law (California Business and Professions Code § 17200) prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

184.    The acts and conduct of Defendants alleged above and herein constitute unlawful business acts or practices prohibited by California Business and Professions Code § 17200.  As more fully alleged above, Defendants violated the Sherman Act and California Cartwright Act, and breached agreements and their fiduciary duties owed to Plaintiff and members of the Class.

185.    The acts and conduct of Defendants alleged above and herein constitute unfair business acts or practices prohibited by California Business and Professions Code § 17200. They offend established public policies and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiff and Class members.  As more fully alleged above, Defendants unjustly enriched themselves at the expense, and to the detriment, of Plaintiff and members of the Class by, *inter alia*, conspiring to maintain VRDO rates that were artificially high and injurious to Plaintiff and members of the Class.  In so doing, Defendants unfairly ensured that Plaintiff and members of the Class paid Defendants more than they otherwise would have for services that Defendants never provided or performed.

186.    The acts and conduct of Defendants alleged above and herein constitute fraudulent business acts or practices prohibited by California Business and Professions Code § 17200.  As more fully alleged above, Defendants deceived and misled Plaintiff and members of the Class with respect to the value and rate of VRDOs, as well as the services that Defendants misled Plaintiff and the Class Members to believe that they were receiving and that Defendants were performing and providing.

187.    For the foregoing reasons, Defendants' acts and omissions alleged above constitute unlawful, unfair, and fraudulent business acts or practices as defined by California Business and Professions Code § 17200.

188.    Defendants should be enjoined from such unlawful, unfair, and fraudulent business practices and acts and should be required to restore to Plaintiff restitution and any and all profits earned as a result of their unlawful, unfair, and fraudulent actions and provide Plaintiff with any other restitution or relief that the Court deems appropriate.

## FOURTH CLAIM FOR RELIEF
### (Breach of Contract)

189.    Plaintiff hereby incorporates and re-alleges each preceding and succeeding paragraph as though fully set forth herein.

190.    Plaintiff, as well as members of the Class, and Defendants entered into Remarketing Agreements governing their conduct as it relates to VRDOs.  Under these Remarketing Agreements and the corresponding Bond Indentures, Defendants had an obligation to reset interest rates for Plaintiff's VRDOs at the lowest possible rate.

191.    Plaintiff and other members of the Class fulfilled all of their obligations under these Remarketing Agreements and Bond Indentures.

192.     Defendants breached their obligations to reset VRDOs at the lowest possible rate and to actively remarket VRDOs that had been retendered at the lowest possible rate.

193.     Plaintiff and other members of the Class have suffered monetary and economic losses and damages in an amount to be determined at trial as a result of Defendants' breaches of the Remarketing Agreements.  Plaintiff and other members of the Class are entitled to be made whole for Defendants' breaches and to be put in the same position they would have been in but for Defendants' breaches.

### FIFTH CLAIM FOR RELIEF
**(Breach of Fiduciary Duty)**

194.     Plaintiff hereby incorporates and re-alleges each preceding and succeeding paragraph as though fully set forth herein.

195.     Plaintiff and Class members are municipal entities, as defined in the Securities Exchange Act, Section 15B.  Defendants provided Plaintiff and members of the Class advice concerning municipal securities and other financial matters (*e.g.*, whether, how, and under which terms to issue, market, and remarket VRDOs).  Defendants' advice were supposedly undertaken to benefit Plaintiff and the Class members and to further their financial goals.  Defendants, therefore, owed them fiduciary duties, including per 15 U.S.C. § 18o-4(c)(1) and California law.

196.     Defendants breached their fiduciary duties by putting their interests above Plaintiff's and the Class members' despite Defendants owing a fiduciary obligation to them. Defendants breached their fiduciary duties by, *inter alia*, entering into Remarketing Agreements knowing that Defendants would never seek the lowest VRDO rates, but would set artificially high rates.

197.     Plaintiff and members of the Class suffered material damage in an amount to be proven at trial as a direct, proximate, and foreseeable result of Defendants' breaches.

## **PRAYER FOR RELIEF**

198.    WHEREFORE, Plaintiff prays for relief against Defendants as follows:

(a)    For an order finding that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3), direct reasonable notice of this action to the Class pursuant to Federal Rule of Civil Procedure 23(c)(2), and declare Plaintiff the representative of the Class;

(b)    For a finding and judgment that Defendants' conduct alleged and averred in this Complaint violates federal and California antitrust laws;

(c)    For a finding and judgment that Defendants breached their contracts with Plaintiff and members of the Class;

(d)    For a finding and judgment that Defendants breached their fiduciary duties owed to Plaintiff and members of the Class;

(e)    For a finding and judgment that Defendants violated the California Unfair Competition Law;

(f)    For a permanent injunction enjoining and restraining Defendants, their agents, employees, representatives, partners, joint venturers, and/or anyone acting on behalf of or in concert with Defendants, from continuing and maintaining the conspiracy alleged and averred in this Complaint under federal and California antitrust laws;

(g)    For declaratory relief;

(h)    For an award to Plaintiff and the Class from Defendants of damages, trebled, for Defendants' violations of federal and California antitrust laws, plus interest;

(i)     For an award to Plaintiff and the Class from Defendants for Defendants' breaches of their contracts with Plaintiff and members of the Class;

(j)     For an award to Plaintiff and the Class from Defendants for Defendants' breaches of their fiduciary duties to Plaintiff and members of the Class;

(k)     For an award to Plaintiff and the Class from Defendants of restitution for Defendants' violations of the California Unfair Competition Law;

(l)     For an award to Plaintiff and the Class from Defendants of their actual damages;

(m)     For an award to Plaintiff and the Class from Defendants of Plaintiff's and the Class's reasonable attorneys' fees and costs, including costs of suit and out-of-pocket expenditures incurred to protect their rights under the Remarketing Agreements and otherwise;

(n)     For an award to Plaintiff and the Class from Defendants of all available interest remedies, including pre-judgment and post-judgment interest, to the fullest extent available under law or equity; and

(o)     For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: Los Angeles, California
      June 2, 2021

BROWNE GEORGE ROSS
O'BRIEN ANNAGUEY & ELLIS LLP

By: _____

Nathan J. Hochman (*pro hac vice* forthcoming)
Carl Alan Roth (*pro hac vice* forthcoming)
Ryan Q. Keech (*pro hac vice* forthcoming)

Noah S. Helpern (*pro hac vice* forthcoming)
Jason Y. Kelly (*pro hac vice* forthcoming)
James L. Michaels (*pro hac vice* forthcoming)
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone:  (310) 274-7100
Facsimile:  (310) 275-5697
nhochman@bgrfirm.com
croth@bgrfirm.com
rkeech@bgrfirm.com
nhelpern@bgrfirm.com
jkelly@bgrfirm.com
jmichaels@bgrfirm.com

BROWNE GEORGE ROSS
O'BRIEN ANNAGUEY & ELLIS LLP
Joachim B. Steinberg
5 Penn Plaza, 24th Floor
New York, New York 10001
Telephone: (212) 413-2600
Facsimile:  (212) 413-2629
jsteinberg@bgrfirm.com

*Attorneys for Plaintiff The Board of Directors of the
San Diego Association of Governments, acting as the
San Diego County Regional Transportation
Commission, on behalf of itself and all others similarly
situated*